**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-mc-00121-NYW

UBER TECHNOLOGIES, INC., RAISER, LLC, AND RAISER-CA, LLC,

     Petitioners-Issuing Parties,

v.

EXPRESS DIGITAL SERVICES, LLC AND SHAWN GRAFT D/B/A EXPRESS DIGITAL SERVICES, LLC,

     Respondents-Subpoenaed Parties.

---

**DECLARATION OF KELLY H. TWIGGER**

---

I, Kelly H. Twigger, declare as follows:

     1.     I am counsel for Respondents Express Digital Services, LLC ("EDS") and Shawn Graft regarding the third party subpoena sent to EDS by Uber in the underlying MDL in which more than 3000 claims have been filed accusing Uber drivers of sexually assaulting their passengers.

     2.     I submit this declaration in support of Respondents' Opposition to Petitioners' Motion to Transfer Proceeding to Enforce Subpoenas Duces Tecum Issued

1

by the U.S. District Court for the Northern District of California to the Issuing Court or to Compel Compliance With Subpoenas.

3.      I have personal knowledge of the facts stated herein.

4.      Express Digital Services, LLC is a nonparty to the underlying multidistrict litigation. It is a sole proprietor LLC owned and operated by Shawn Graft.

5.      I met and conferred with counsel for Uber regarding compliance with the subpoena on multiple occasions between October 16, 2025, and December 8, 2025.

6.      During our initial meet and confer on October 16, 2025, held via Zoom, I asked the three partners from Shook, Hardy and Bacon on the call — Michael Shortnacy, Joshua Taylor and Adam Shoshtari — whether we could record the call using my AI notetaker so that there would be no confusion about what was discussed or agreed to by the parties. I informed them that they would receive a copy of the notes as participants on the call, as well as access to the recording. Mr. Shortnacy refused to allow the recording, so I instead took detailed handwritten notes about the meet and confer calls in order to be clear about what my client would provide and what both parties agreed to do.

7.      During that call, I advised counsel that Express Digital Services owned and operated the following services that were used to generate receipts: MakeReceipt.com, ExpenseFast.com, InvoiceWriter.com, ExpressExpense, DocDesk.co. and PDFPro.us, ("the Services") and that I was authorized to accept service of a subpoena directed solely to Express Digital Services. I had reviewed the earlier subpoenas directed to the client in preparation for the call. Counsel for Uber

2

agreed to modify the subpoena and to drop the subpoena against Shawn Graft in his individual capacity/dba Express Digital Services. The modified subpoena I received and to which EDS responded is attached as Exhibit A.

8.    I advised Uber that EDS was willing to cooperate with Uber in providing the information it was seeking, but that it needed to have its investigator, Blake Schnitker, stop contacting Shawn Graft, and that all communications should go through me regarding the subpoena. I also advised Counsel for Uber that my client was a sole proprietor, and that the cost of compliance of the subpoena was significant and that we would be seeking costs under Rule 45.

9.    In terms of available data, I advised counsel of the following information regarding the data at EDS:  1) that EDS does not store first and last names, but that it captured email addresses for paid accounts, as well as the script that generated the receipt (API calls), the IP address used to connect to the Services, the data and time of each transaction, and the Stripe ID provided to the Services for paid accounts, and 2) that EDS does not retain images of the receipts generated by users older than 14 days whether they are created using free access or on a paid account. As a result, EDS could provide the "contact information" it had that was available under Requests 1 and 2 of the subpoena, but that it had no information responsive to Requests 3 and 4.

10.    During that same call, counsel for Uber advised me that:

    a.  The data range for responsive information to the subpoena was January 1, 2018 to the present;

    b.  Neither EDS nor Shawn Graft was a target of the litigation;

c.  Uber agreed to modify the subpoena to name only EDS;

d.  They were surprised that names and receipts were not retained for the Services;

e.  That Uber wanted the following data from the Services given what was available:  email addresses, the script used to generate the receipt (API call) and the date and time of the transactions for anyone who created a receipt using an Uber template;

f.  That the goal was to load EDS's data against the database they have of plaintiffs and see who would have generated Uber receipts from EDS's websites or apps; and

g.  That Uber was anxious to have the information as quickly as possible given that the first bellwether trial was set to begin in January 2026; and

h.  That EDS could produce documents by uploading them to their Secured File Transfer Protocol versus incurring the cost to provide a formal production since the data would be native excel spreadsheets. Counsel then provided access credentials to me from Kite, its SFTP platform.

11.  Uber did not request Stripe IDs or IP addresses during the meet and confer.

12.  Uber served the subpoena to me via email on October 17, 2025. The subpoena included four categories of requested documents:

4

1. ANY AND ALL DOCUMENTS identifying CONTACT INFORMATION for ANY AND ALL PERSONS that have ever used OR accessed ANY website developed, maintained, OR operated by YOU, INCLUDING MakeReceipt.com OR ExpressExpense.com, to generate an Uber ride receipt from January 1, 2018 to present.

2. ANY AND ALL DOCUMENTS identifying CONTACT INFORMATION for ANY AND ALL PERSONS that have ever used OR accessed ANY smartphone application developed, maintained, OR operated by YOU, INCLUDING Make Receipt, ExpressExpense, OR Make Receipt Receipt Creator, to generate an Uber ride receipt from January 1, 2018 to present.

3. ANY AND ALL DOCUMENTS containing API data RELATED TO, OR which otherwise depict, ANY AND ALL Uber ride receipts generated from January 1, 2018 to present, using ANY website developed, maintained, OR operated by YOU, INCLUDING MakeReceipt.com OR ExpressExpense.com.

4. ANY AND ALL DOCUMENTS containing API data RELATED TO, OR which otherwise depict, ANY AND ALL Uber ride receipts generated from January 1, 2018 to present, using ANY smartphone application developed, maintained, OR operated by YOU, INCLUDING Make Receipt, ExpressExpense, OR Make Receipt Receipt Creator.

13.    Ten days later, on October 26, 2025,  Express Digital Services produced spreadsheets containing the responsive data requested by Uber from the Services by uploading the native spreadsheets to the SFTP site provided by Uber. The spreadsheets contained a total of more than 34,000 transactions representing users who had created a receipt using the Uber templates provided by the Services.

14.    On October 30, 2025, I emailed Michael Shortnacy to confirm that EDS had fully complied with the subpoena. He replied that Uber did not believe EDS had fully complied despite the fact that EDS had produced all "contact information" EDS had for all transactions where a user created a receipt using an Uber template.

15.    The parties met and conferred again on November 6, 2025. At that time, I responded to multiple inquiries regarding the data provided, what was retained for receipts generated for free (again nothing) and that data provided was for paid plans. I also confirmed the language contained on watermarks on free receipts generated by the Services, and asked to see copies of the receipts that Uber alleged were created using EDS's Services. Counsel for Uber indicated that the email addresses provided by EDS were "masking the real emails so [Uber] can't tie them to the same person." Counsel wanted "more information to be able to identify the user." I responded that EDS had provided all of the information that is available and responsive to the subpoena. Because we had no additional identifying information, and they were unable to match the email addresses provided to plaintiffs in their system, Uber now wanted *all Stripe IDs of all 34,000 transactions* in order to subpoena information from Stripe. I explained to Counsel that the only identifying information my client retained that was responsive to

the subpoena had been produced in the form of email addresses, and that is the same information transmitted to Stripe to create the Stripe ID. Uber can use those emails to go to Stripe with a subpoena. I again raised the issue of Uber paying EDS's costs on the subpoena including both attorneys fees and his costs and advised of the costs to date given the increased volume of meet and confers since production. Mr. Shortnacy agreed to speak with his client on the issue.

16.     On November 10, 2025, I emailed Mr. Shortnacy again asking about his discussions with his client on paying my client's costs. See Exhibit B. He did not respond.

17.     On November 17, 2025, I emailed counsel for Uber regarding additional questions raised in the November 6th call regarding the watermarks on receipts generated for free, and asked again for Uber to provide copies of the receipts it believed were generated by my client's Services. At that time, the only open issue on compliance with the subpoena was the Stripe IDs. I also advised Uber that my client would be traveling and out of the country from Thanksgiving until January 6, 2026, and offered to connect to resolve issues prior to that even while I was traveling on another matter.

18.     On November 21, 2025, Uber's demands escalated again. I participated in a meet and confer with Uber's counsel Michael Shortnacy, Jay Haider, and Jeremy Wikler from the Shook Firm. Uber again asked if names were available for the transactions at issue; I advised for the third time that they were not.

19.     Uber expressed the need to resolve the Stripe issue; I again explained my client's position that 1) the Stripe ID's were not "contact information" under the

7

Subpoena, 2) that we had provided all of the same information provided to Stripe and 3) that Rule 45 was not intended to be used as an investigation tool to jump from non-party to non-party. Under a subpoena, Stripe could use the emails provided to identify any information it has in the same manner that EDS has done. Given Uber's belief that users had input masked email addresses, I requested specific transaction data from what was produced (line by line from the spreadsheets produced by EDS) that Uber believed were masked or some other evidence to identify specific transactions for us to provide those Stripe IDs.

20.     For the first time, Mr. Shortnacy acknowledged that it had tested EDS's data against its database of plaintiffs and received no matches. Uber then asked for IP addresses for all 34,000 transactions; I responded that the subpoena did not cover IP addresses and that Uber was already given an opportunity to choose the fields of data it wanted and it did not ask for them. To comply at this point would require a guarantee that Uber would cover my client's costs as Uber had stated it would multiple times in writing.

21.     Uber's demands then escalated to require a declaration from Shawn Graft that the data being produced has been fully "verified". And despite the fact that the subpoena was limited to document production, counsel threatened that they "can depose him, but there isn't a problem with the information."  I requested the legal basis for requiring a declaration following production from a non-party under Rule 45, either by rule or case law. Mr. Shortnacy provided neither. I also pointed out that the subpoena issued was for documents, not a deposition.

8

22.     Mr. Shortnacy also represented to me during the call that Uber had already subpoenaed Stripe.

23.     Mr. Shortnacy followed with an email to me later that afternoon stating that "we need confirmation in the form of a declaration from your client that certain information you have conveyed to us during our prior conferrals and written communications is accurate.  We do not have reason to doubt you but would simply like to have confirmation the information conveyed to you, and then us, is accurate." The email laid out the bullets they sought in a declaration. See Exhibit C.

24.     Mr. Shortnacy's email also conceded that counsel for Uber explained that Uber had attempted to cross-check the email addresses produced by EDS against information available in the MDL but had not identified any matching individuals. Counsel stated that Uber therefore requested the Stripe transaction identifiers associated with EDS user accounts so that Uber could attempt to obtain additional information about those users through Stripe and conduct further cross-checking to determine whether any such users might be connected to claims in the MDL.

25.     Finally, despite threats of a deposition and a request for IP addresses, Uber offered that by providing the declaration and the Stripe IDs for all produced transactions, Uber would consider compliance and cover costs as they had been stated in mid-October**:** "In addition, in line with the above, Uber is willing to cover your client's reasonable fees for compliance, with confirmatory information to be provided by you (e.g., invoice, W-9, etc.), which we understand from our last call was then around $3,500."

9

26.     In response that same evening,  I informed Uber's counsel that I was not aware of any provision of the Federal Rules of Civil Procedure requiring a non-party to provide such a declaration in response to a Rule 45 subpoena and asked that they provide any authority supporting that request. I also noted that Uber had advised that its comparison of the email addresses produced by EDS against information available to Uber had not identified any matching individuals. Based on that representation, I explained that Uber's request that EDS produce Stripe transaction identifiers for more than 34,000 transactions appeared overbroad. I stated that if Uber believed particular email addresses in the production were masked or otherwise required further review, Uber could identify those specific entries and provide the basis for that belief so the parties could evaluate whether any narrower production would be appropriate. I also advised Uber's counsel that the costs incurred by EDS in responding to the subpoena were continuing to increase, including attorneys fees and the time required for EDS personnel to run searches and compile the requested data, and that the costs referenced in my October call had more than doubled in attorneys fees. Exhibit D.

27.     Mr. Shortnacy responded on November 26, 2025 at 9:34pm, the night before Thanksgiving with the following:

"As we discussed on our call on Friday, plaintiffs in the Uber MDL have used your client's services to create non-bona fide Uber receipts. But your client has not produced information sufficient to identify these and other plaintiffs who have used your client's services.  As I explained on our call, the email addresses provided by your client to date do not necessarily tie to any information (i.e., other email address) that has been disclosed in the MDL by a plaintiff, which only underscores the insufficiency of the production and why we need your client to produce the Stripe IDs that you previously said your client would produce but are now withholding.  You have explained to us that there is no substantial burden in providing this Stripe ID information, and that it would be a matter of exporting that

10

field from your client's systems correlating to the information your client has already provided.

Because your client is now refusing to provide information that could be used to determine which plaintiffs in the MDL have used your client's services to create non-bona fide Uber receipts and because your client is refusing to state under oath (by answering the simple questions posed below) that he does not have other information that could be used to identify individuals who have used his services (even though his website and Terms of Use indicates otherwise), it is apparent to us that we have reached an impasse. Uber will exercise its rights under Pre Trial Order No 8 in the MDL, and expressly reserves its rights and remedies under all applicable rules and procedures to enforce the Subpoena.

Exhibit E.

28.     To date, Uber has never provided me or my client with any evidence, either digital or hard copy, that receipts submitted by plaintiffs in the MDL were created using any of EDS's Services.

29.     EDS did not consent to the jurisdiction of the MDL for any enforcement proceeding, and notified Uber's Counsel of the lack of consent on December 8, 2025.

30.     15 days later, on December 23, 2025, Uber filed the current motion with the District of Colorado. At the same time, Uber filed a tag-along action with the Judicial Panel on Multi-District Litigation (JPML). Both motions sought transfer of this narrow Rule 45 dispute to the MDL court. EDS moved to vacate the conditional transfer order issued by the JPML, and that motion is being heard without argument from the parties on March 26, 2026, one day after the filing is complete on this Motion. Uber's filing of a tag along motion has dramatically increased the costs for EDS to respond in various courts on this motion.

31.     Throughout my representation of EDS in connection with this subpoena, I have been mindful that EDS is a small business operated by a sole proprietor and have

11

taken steps to conduct this matter as efficiently as possible in order to minimize the costs imposed on EDS while responding to Uber's requests.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 11th day of March, 2026.

*/s/ Kelly H. Twigger*
Kelly H. Twigger
ESI Attorneys LLC
2945 Juilliard Street
Boulder, CO 80305
720-370-0435
ktwigger@esiattorneys.com
*Counsel for Respondents*